1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TELECOM ASSET MANAGEMENT, LLC,

Plaintiff.

v.

FIBERLIGHT, LLC,

Defendant.

Case No.  14-cv-00728-SI

**VERDICT IN CIVIL CASE:  FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a civil case in which the parties jointly withdrew the jury demand. Dkt. No. 94 (Stip.).  Following a three-day bench trial, in consideration of the evidence presented, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.    The Relevant Stakeholders

Plaintiff Telecom Asset Management ("TAM") is a limited liability company with its principal place of business in California.  Dkt. No. 129 (Joint Prop. Findings) ¶ 1.  TAM is a telecommunications services agent and consultant which uses its relationships and industry information to secure business transactions, in this case between two telecommunication carriers, defendant FiberLight, LLC ("FiberLight") and Verizon Wireless ("Verizon").[1]  *Id.*

Steven Strong is TAM's President and Timothy Burks is TAM's Chief Operating Officer ("COO").  *Id.* at ¶ 2.

FiberLight, LLC is organized in Delaware with its principal place of business in Georgia.

---

[1]  Verizon is not a party to this matter.

*Id.* at ¶ 3.  Among other services, FiberLight builds telecommunication networks for a number of its clients.  *Id.*

Michael Miller served as Chief Executive Officer ("CEO") of FiberLight until the end of his employment on February 4, 2013.  Kevin Coyne is FiberLight's Chief Financial Officer ("CFO") and has also served as its President and COO.  Benjamin Edmond served as FiberLight's President of Sales & Marketing from November 30, 2010 until October 2012.  *Id.* at ¶ 4.

## II.    The October 3, 2011 Meeting

On October 3, 2011, Strong and Burks of TAM met with Miller and Edmond of FiberLight at an industry conference.  *Id.* at ¶ 11.  At the meeting Strong and Burks shared that they were in contact with Verizon, and that Verizon was looking for different products and services to put into its network.  *Id.* at ¶ 12; Dkt. No. 130 (Plaintiff's Prop. Findings) ¶ 9.  Miller expressed a strong interest in this work, stating that he would "give his right arm" to do business with Verizon.  Dkt. No. 130 ¶ 9.  Previous to this, FiberLight had no success penetrating Verizon's channels in order to secure business.  *Id.*

Strong or Burks then asked Miller or Edmond what FiberLight paid its sales agents.  *Id.* at ¶ 10.  Miller or Edmond explained that FiberLight's agent commissions were "in line with industry standards."  *Id.*  Strong or Burks then asked, "so, 10-15%?"  Miller or Edmond responded to this question in the affirmative.  The takeaway from the meeting was that Edmond would send to TAM a written agent agreement to formalize the parties' discussions.  In other words, at the October 3, 2011 meeting, the parties entered into an "agreement to agree" — the material terms of which would be worked out later.

FiberLight, however, did not deter TAM from commencing work on FiberLight's behalf prior the written agreement being signed.  *Id.* at ¶ 14.

## III.   TAM's Work for FiberLight, the Continued Negotiations and the Failure to Execute An Agency Contract

Three days later, on October 6, 2011, Burks contacted Edmond to put in motion the first FiberLight-Verizon deal, hereinafter referred to as the "Houston-Bryan" deal.  Dkt. No. 129 (Joint

1    Prop. Findings) ¶ 17.   On October 13, 2011, Edmond emailed to TAM a copy of FiberLight's

2    standard written agent agreement.   *Id.* at ¶ 18; *see also* Plaintiff Exh. 10.   This was the first legally

3    operative offer for agent services exchanged between the parties.

4         Section 4.1.1 of the agreement provided for agent commissions of between 10-15% of

5    monthly recurring revenue, or "MRR," based on a sliding scale, with higher MRR for FiberLight

6    yielding a higher percentage of commissions for the agent responsible.   Dkt. No. 129 (Joint Prop.

7    Findings) ¶ 19; *see also* Plaintiff Exh. 10 at 2.

8         Section 4.1.6 gave FiberLight the ability to modify the rates set forth in Section 4.1.1 by

9    proposing new or different commission rates "on an individual case basis [ICB] to circuits that

10   require special circumstances, such as *construction*, equipment or management." *Id.* (emphasis

11   added).   Section 4.1.6 also provided that FiberLight "must present the ICB commission rate at the

12   time of giving the agent pricing for the circuit.   The Agent will agree in writing or electronic form

13   *i.e.* email to the amended ICB Commissionable Rate."   Dkt. No. 129 (Joint Prop. Findings) ¶ 19;

14   *see also* Plaintiff Exh. 10 at 3.

15        This form agreement contained no provision for commissions on non-recurring revenue, or

16   "NRR." *See* Plaintiff Exh. 10.

17        On or about November 18, 2011, TAM put in motion the second FiberLight-Verizon deal,

18   hereinafter referred to as the "West Texas" deal.   Dkt. No. 129 (Joint Prop. Findings) ¶ 24.

19        Sometime in December 2011, TAM put in motion the third FiberLight-Verizon deal,

20   hereinafter referred to as the "Lubbock-Schertz" deal, as well as the fourth FiberLight-Verizon

21   deal, hereinafter referred to as the "Central Texas" deal.   *Id.* at ¶ 25; Dkt. No. 130 (Plaintiff's

22   Prop. Findings) ¶ 24; Dkt. No. 131 (Def. Prop. Findings) ¶ 17.

23        FiberLight and Verizon signed a written letter of intent for the West Texas deal on or about

24   January 4, 2012.   Dkt. No. 129 (Joint Prop. Findings) ¶ 30.

25        There was still no contract for agent services in place between TAM and FiberLight.

26        On January 13, 2012, TAM provided a written redline to Edmond's initial written offer.

27   *Id.* at ¶ 32; *see also* Plaintiff Exh. 32.   This was TAM's first legally operative counteroffer, which

28   extinguished FiberLight's initial offer.   The redline retained the sliding scale of 10-15% MRR

commissions and added a blank "[____]" for NRR.  Dkt. No. 129 (Joint Prop. Findings) ¶ 32; *see also* Plaintiff Exh. 32 at 3-4.  TAM's redline also retained the provision that projects requiring construction could be individually negotiated, or ICB.  Dkt. No. 129 (Joint Prop. Findings) ¶ 32; *see also* Plaintiff Exh. 32 at 5.

On or about February 14, 2012, Strong emailed Edmond a summary of all of the projects TAM had brought to FiberLight along with a spreadsheet showing TAM's commissions at a rate of 15% of MRR *and* 15% of NRR.  *See* Plaintiff Exh. 43.  Edmond immediately replied to Strong's email, denying that the parties had agreed to "a flat 15% on everything." *Id.*; *see also* Dkt. No. 129 (Joint Prop. Findings) ¶ 33.

The next day, Edmond sent a written redline back to TAM.  Dkt. No. 129 (Joint Prop. Findings) ¶ 34.  This redline extinguished TAM's counteroffer and became a new legally operative offer.  The redline retained the 10-15% sliding scale commission payments for MRR, but provided for 2% of NRR.[2]  *See* Redline Agent Agreement 2/15/2012 (Def. Exh. 156-A and Def. Exh. 157) at 3-4.  The requirement that any ICB Commission be made in writing prior to customer agreements being signed remained in the document.  Def. Exh. 156-A and Def. Exh. 157 at 6.

The parties' negotiations eventually broke down, although the parties made various efforts through December 2012 to negotiate TAM's compensation in lieu of a signed agreement. Dkt. No. 129 (Joint Prop. Findings) ¶ 52.  TAM continued to work on FiberLight's behalf for almost all of 2012.  Dkt. No. 130 (Plaintiff's Prop. Findings) ¶ 52.

**IV.    The Four Deals at Issue**

There are four deals for which TAM contends it is owed commissions:  (1) Houston-Bryan; (2) West Texas; (3) Central Texas; and (4) Lubbock-Schertz.  Dkt. No. 129 (Joint Prop. Findings) ¶ 38.  The Court finds that, at all relevant times, TAM was acting in an agent role for

---

[2]  FiberLight's redline distinguished between "on net" MRR and "off net" MRR and made "off net" MRR subject to a 5-7% rate of commission.  *See* Def. Exh. 157.  NRR was also split into "on net" and "off net" categories.  *Id.*; *see also* Dkt. No. 131 (Def. Proposed Findings) ¶¶ 69-70, 72-73.  These distinctions will be discussed in further detail below.

FiberLight's benefit at FiberLight's request, despite the absence of a contract. *Contra* Dkt. No. 131 (Def. Proposed Findings) ¶¶ 16, 22.

The Houston-Bryan and Lubbock-Schertz deals were similar projects, under which FiberLight agreed to provide lit services with the option to convert to dark fiber. Dkt. No. 129 (Joint Prop. Findings) ¶ 39. Ultimately, both deals required monthly recurring payments (MRR) from Verizon to FiberLight, and they were solely MRR deals. Dkt. No. 131 (Def. Proposed Findings) ¶¶ 8, 15. The Houston-Bryan deal terminated in July 2016, the Lubbock-Schertz deal terminated in December 2015. *Id.* at ¶ 26.

The West Texas and Central Texas deals were similar projects, in that they involved large scale networks on which FiberLight would be paid for a twenty-year term for thousands of route miles of dark fiber. Dkt. No. 129 (Joint Prop. Findings) ¶ 40. The contracts for both West and Central Texas had large, non-recurring revenue (NRR) payments at the outset by Verizon to FiberLight to cover costs such as construction, in addition to monthly recurring revenue (MRR) to cover costs such as maintenance. *See* Dkt. No. 131 (Def. Proposed Findings) ¶¶ 13, 20. Unlike Houston-Bryan and Lubbock-Schertz, the MRR payments on West and Central Texas are to be paid over 20 years. *Id.*

FiberLight and Verizon executed Master Service Agreements on or about March 4, 2012. Dkt. No. 129 (Joint Prop. Findings) at ¶ 41. FiberLight and Verizon executed a service order form (SOF) for Houston-Bryan on or about March 30, 2012. *Id.* at ¶ 42. FiberLight and Verizon executed an SOF for Lubbock-Schertz on or about March 30, 2012. *Id.* at ¶ 43. FiberLight and Verizon executed an indefeasible right of use (IRU) agreement and SOF for West Texas on or about June 28, 2012. *Id.* at ¶ 44. FiberLight executed an IRU agreement and SOF for Central Texas on or about November 27, 2012. *Id.* at ¶ 45. Both Edmond and Miller testified that the Houston-Bryan, West Texas, and Lubbock-Schertz projects between FiberLight and Verizon would not have happened without TAM's involvement. *Id.* at ¶ 46. The Court finds this is also the case with Central Texas.

In terms of revenue received, West Texas and Central Texas are the largest deals in FiberLight's history. *Id.* at ¶ 47. Both deals are expected to generate a profit on or around 2025.

1    Dkt. No. 131 (Def. Proposed Findings) ¶ 27.  According to the parties, total MRR for the Houston-

2    Bryan and Lubbock-Schertz deals was $1,407,500; total expected MRR for the West Texas and

3    Central Texas deals is $195,197,933; and total expected NRR for the West Texas and Central

4    Texas deals is $102,770,076.[3]

5        To date, FiberLight has not paid TAM.  Dkt. No. 129 (Joint Prop. Findings) ¶ 50.

6    FiberLight continues to believe that it owes TAM money.  *Id.* at ¶ 48.

7

8    **V.      The Experts and "On-Net" versus "Off-Net"**

9        Both parties called experts to testify at trial on the subject of telecommunication agents

10   like TAM and the "industry standard" for a typical agent's compensation structure.  Both parties

11   stipulated to admit the report of each expert, and the Court accepted the stipulation.  *See*

12   McGinness Rpt. (Plaintiff Exh. 1); Gutshall Decl. (Def. Exh. 183).

13       Plaintiff's expert McGinness opined in his report that telecommunications services are

14   generally categorized either as "lit services," which are offered over fiber networks that already

15   pass telecommunications traffic and are operated by the providers, or as "dark fiber transactions,"

16   which involve the carrier either constructing purpose-built fiber or providing fibers from the

17   carrier's or a third party's inventory.  He identified both types of services in the four transactions

18   at issue.  Defendant's expert Gutshall recognized in his testimony the "lit" and "dark fiber"

19   classifications, but further identified transactions, or parts of transactions, as "on-net" and "off-

20   net," depending on whether the fiber involved was on (*i.e.*, assets located on) the provider's

21   network or not.  At trial, both experts testified regarding agent commission payments that would

22   apply in "on-net" versus "off-net" deals; they disagreed in substantial part over the time at which

23   the "on-net" or "off-net" assessment should be made.  The Court finds that this "on-net"/"off-net"

24   distinction is not dispositive of this dispute.  The Court finds that the material distinction between

25

26   _____

[3]  The parties stipulated to provide the Court with an Excel spreadsheet to assist the Court in its

27   calculations, and stipulated that the amounts found in that spreadsheet were accurate.  *See* Demonstrative Aid (Def. Exh. 188) at VzW Long Haul Circuits Tab, VzW Monthly Recurring Revenue Tab, VzW Non-Recurring Gross Revenue Tab; *see also* Texas Scorecard (Def. Exh.

28   187).

United States District Court
Northern District of California

these four deals is the difference between Houston-Bryan and Lubbock-Schertz on the one-hand (*i.e.*, projects for lit services) and West Texas and Central Texas on the other (*i.e.*, dark fiber transactions), as explained by plaintiff's expert McGinness:

> Lit services are generally offered over fiber networks that already pass telecommunications traffic and are operated by the providers. Agreements for lit services generally have a term of 1 to 5 years. The provider usually charges some non-recurring fees to the purchaser at the outset (NRR) and thereafter charges for usage on a monthly basis throughout the term of the agreement for services (MRR).
>
> Dark fiber transactions generally involve carrier constructing purpose built fiber for the customer or providing the customer fibers from inventory on its network and require the purchaser to light and operate the fiber as part of their own network. Agreements for dark fiber often take the form of an indefeasible right of use (IRU) and have a term of 20 years or longer. The provider usually charges a large, non-recurring fee to the purchaser at the outset (NRR), which may or may not be broken into more than one payment, and thereafter charges operations and maintenance on an annual (or occasionally monthly or semi-annual) basis (MRR).

*See* McGinness Rpt. at 10.

The Court finds that the original written agent agreement sent by FiberLight to TAM on October 13, 2011 was intended by FiberLight to cover commissions for TAM pursuant to the Houston-Bryan deal — a project for lit services. *See* Dkt. No. 129 (Joint Prop. Findings) at ¶ 39. But the West Texas, Central Texas, and Lubbock-Schertz opportunities followed Houston-Bryan in quick succession, and the parties did not contemplate, nor could they reach agreement on, the appropriate agent commission structure for the dark fiber transactions. *See id.* at ¶ 40.

Each party wrongly assumed that a lack of formal written agreement, and the ambiguities presented by the situation, would ultimately work in that respective party's favor.[4] This perilous path brought the parties before this Court.

---

[4] *See*, for example, Pl. Exh. 81, April 30, 2012 email from John Schmitt, FiberLight's Vice President of Business Development, to Ben Edmond, FiberLight's President of Sales and Marketing: "They [TAM] are scared relative to timing of us getting purchased. TIME is weighing VERY heavy on them right now Ben. Every tick of the clock hurts them. We need to use that to our favor."

**CONCLUSIONS OF LAW**

Four causes of action remain following TAM's dismissal of several others at the start of trial:   (1) breach of contract (Count 1); (2) breach of implied contract (Count 2); (3) restitution/unjust enrichment (Count 8); and (4) violation of the California Independent Wholesale Sales Representatives Contractual Relations Act (Count 14).  *See* Dkt. No. 1.  The Court finds that only restitution/unjust enrichment is supported by the evidence.

### I.      Breach of Contract

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (Cal. 2011) (citation omitted).  But if the essential terms of the contract are "only sketched out, with their final form to be agreed upon in the future . . . the parties ha[ve] at best an 'agreement to agree,' which is unenforceable under California law."  *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 213-14 (Cal. Ct. App. 2006).   "Preliminary negotiations or agreements for future negotiations are not the functional equivalent of a valid, subsisting agreement."  *Id.* (citations and internal alterations omitted).  "[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract." *Id.* at 213-214 (citation omitted).

The evidence shows that the parties' discussion at the October 3, 2011 meeting was a preliminary agreement to enter into a written agreement, with the terms and conditions to be finalized at a later date.  The parties' discussion of the "industry standard" or 10-15% payment that FiberLight paid its agents was a broad sketch of what an agreement might look like, but the parties failed to achieve a meeting of the minds on all material points, as evidenced by the back-and-forth on the issue of the appropriate commission percentage payment.

### II.      Breach of Implied-In-Fact Contract

Because the parties did not reach a mutual agreement expressed by conduct, there was no

8

implied-in-fact contract in this case.  "A contract is either express or implied." Cal. Civ. Code § 1619.  "An implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ. Code § 1621. "[I]mplied-in-fact contracts are . . . more accurately described as express contracts proved by circumstantial evidence." *Desny v. Wilder*, 46 Cal. 2d 715, 739 n.9 (Cal. 1956).  A commonly cited example is where parties continue to perform under the terms of their agreement after the written contract expires.  *See U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (citing *British Motor Car Distributors, Ltd. v. New Motor Vehicle Bd.*, 194 Cal. App. 3d 81, 91 (Cal. Ct. App. 1987)).

As explained above, there was no ascertainable agreement of the parties in this case.  What began as an attempt to reach agreement on commissions quickly deteriorated, as FiberLight's standard agent agreement on its face did not encompass the NRR components of the West and Central Texas deals, and the parties could not agree on how to structure TAM's payment based on this expanded framework.

### III.    Restitution/Unjust Enrichment (Contract Implied-In-Law)

"The so-called 'contract implied in law' in reality is not a contract."  *Weitzenkorn v. Lesser*, 40 Cal. 2d 778, 794 (Cal. 1953) (citations omitted).  Quasi-contracts arise under the law of restitution as a remedy against unjust enrichment; "unlike true contracts, [they] are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice." *Id.* (citations and internal quotation marks omitted).   "Quasi contractual recovery is based upon benefit accepted or derived for which the law implies an obligation to pay. 'Where no benefit is accepted or derived there is nothing from which such contract can be implied.'" *Id.* (citations omitted).   The benefits conferred must ordinarily occur as a result of defendant's request; otherwise, though there is enrichment, it is not unjust.  *See Nibbi Bros., Inc. v. Home Fed. Sav. & Loan Assn.*, 205 Cal. App. 3d 1415, 1422 (Cal. Ct. App. 1988).

The Court finds that TAM operated at FiberLight's request to secure Verizon's business for FiberLight's benefit.  The Court finds that it must imply a contract in law where none existed

9

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

between these parties to prevent FiberLight's unjust retention of the benefit of TAM's efforts.

California courts have stated that there is no standard formula to measure unjust enrichment. *Meister v. Mensinger*, 230 Cal. App. 4th 381, 401 (Cal. Ct. App. 2014) (citation omitted). "But as with any other pecuniary remedy, there must be some reasonable basis for the computation." *Id.* (citation omitted). Courts in California have favorably referenced the new Restatement (Third) of Restitution and Unjust Enrichment,[5] which provides ways to measure the benefit conferred, such as: (a) the value of the benefit in advancing the purposes of the recipient; (b) the cost to the claimant of conferring the benefit; (c) the market value of the benefit; or (d) a price fixed by agreement between the claimant and the recipient, if the recipient's assent may be treated as valid on the question of price. Restatement (Third) Restitution and Unjust Enrichment § 49 (2011). On some occasions,

> [T]wo or more possible measures of enrichment will yield the same result . . . [W]hen a professional recovers in restitution for the value of the services rendered pursuant to an unenforceable contract, there will not necessarily be a meaningful distinction between the value of the services to the recipient, their cost to the claimant, their market value, and a price fixed by the unenforceable agreement.

*Id.* at § 49 cmt. a.

The Court finds that there was no meaningful disagreement between the parties concerning the rate of MRR payments to be paid on lit services, in this case, the Houston-Bryan deal and later the Lubbock-Schertz deal. According to the terms of FiberLight's standard agent agreement, the rate to be paid was 11% based on the commissionable revenue, which was $20,000/month for Houston-Bryan, and $12,500/for Lubbock-Schertz. *See* Agent Agreement 10/13/11 (Plaintiff Exh. 10) at 2; Redline Agent Agreement 1/13/2012 (Plaintiff Exh. 32) at 3; Redline Agent Agreement 2/15/2012 (Def. Exh. 156-A and Def. Exh. 157) at 3-4; Demonstrative Aid (Def. Exh. 188) at VzW Long Haul Circuits Tab. The Court will accordingly award $154,825 to TAM in restitution for its agent services on these projects.[6]

---

[5] *See, e.g., Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1491 (Cal. Ct. App. 2014); *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 894 (Cal. Ct. App. 2010).

[6] This figure is based on an 11% commission rate on the total MRR received on these two projects, which was $1,407,500.

United States District Court
Northern District of California

1    The more difficult task is calculating the appropriate commission on the NRR and MRR

2    for the West and Central Texas dark fiber deals.  The Court finds that the market value of the

3    benefit conferred is the most appropriate means of calculating restitution in this case.    To

4    determine the market value, the Court observed the competing expert testimony and reviewed the

5    expert reports of TAM's expert, Mark McGinness, as well as FiberLight's expert, Eric Gutshall.

6    *See* McGinness Rpt. (Plaintiff Exh. 1); Gutshall Decl. (Def. Exh. 183); Gutshall Rebuttal Rpt.

7    (Def. Exh. 184).

8    The Court finds FiberLight's expert, Eric Gutshall, persuasive for the purpose of

9    distinguishing between MRR and NRR; for example, as Mr. Gutshall explains, MRR and NRR are

10    normally treated as separate rates and not as a combined rate in the telecommunications industry.

11    Gutshall Decl. (Def. Exh. 183) at ¶ 21.  The Court does not find credible, however, the explanation

12    that agents are paid on an industry-wide basis based on the carrier's net (as opposed to gross)

13    revenue.  *See id.* at ¶¶ 20-21.  As TAM's expert Mark McGinness explains:

14    > [A]gents have no control over carrier pricing, the profitability of a
>    transaction, or how the seller executes on its plans after the contracts
15    > are signed with the customer.  Profitability of a transaction is not
>    used to determine commission payments because commissions are
16    > typically paid during the first few years of the contract term,
>    whereas the transaction's profitability is neither known nor
17    > knowable until the end of the contract term . . . As a result, it is the
>    carrier, rather than the agent, that bears the risk of cost overruns or
18    > inaccurate forecasting.

19    McGinness Rpt. (Plaintiff Exh. 1) at 11.

20    The Court will accordingly measure the market value of TAM's commission rate based on

21    the gross revenues received on the West and Central Texas dark fiber deals, separating NRR from

22    MRR.

23    For MRR, McGinness opined that 10-15% of gross revenue is the industry standard for

24    commissions.  *Id.* at 11, 13-14.  Gutshall opined that 0-15% is the industry standard for an "off

25    net" MRR deal and 10-15% is the industry standard for an "on net" MRR deal.  Gutshall Decl.

26    (Def. Exh. 183) at ¶ ¶ 18-19.  As the Court explained above, and as plaintiff's expert McGinness

27    opined, the distinction FiberLight tries to draw between "on net" and "off net" transactions has no

28    material significance in this case.  It is clear that FiberLight's dilemma in its dealings with TAM,

United States District Court
Northern District of California

as reflected in its initial redlines distinguishing between "on net" and "off net" commission payments, was *how* to calculate a payment percentage that still made the larger dark fiber deals favorable to FiberLight, given the lengthy MRR payment schedule (payments to be made over a 20-year term), the large upfront NRR payments, and the costs, time of payout, and revenue risk. *See* Redline Agent Agreement 2/15/2012 (Def. Exh. 156-A and Def. Exh. 157) at 3-4; *see also* Dkt. No. 131 (Def. Proposed Findings) ¶¶ 13, 20 (explaining the contract value of MRR and NRR). As McGinness explained, carriers must account for "costs (including changes/overruns), budgeting, financing, business cases, execution, timelines . . . and similar metrics that the carrier uses to set pricing and profitability targets." McGinness Rpt. (Plaintiff Exh. 1) at 11. Testimony from FiberLight executives at trial, including Kevin Coyne its CFO, suggested that both the West and Central Texas deals were not as profitable as FiberLight initially anticipated, and FiberLight asserts that West and Central Texas "are currently in a significant loss position." *See* Dkt. No. 131 (Def. Proposed Findings) ¶¶ 27, 107-108. The Court finds that TAM is not responsible for, and had no control over, FiberLight's initial pricing of these projects.

This is an important consideration in terms of the Court's equity power. While FiberLight's current economic position is unfortunate, both experts agree that a 10% commission payment on MRR is within the industry standard. The Court will accordingly award $14,239,978 to TAM in restitution for the market value of their agent services on the MRR component of the West and Central Texas projects,[7] a figure which takes into account a discount rate of 11.6%.[8]

For NRR, McGinness again asserts that 10-15% of gross revenue is the industry standard for commissions. McGinness Rpt. (Plaintiff Exh. 1) at 11, 13-14. Gutshall contends that 0-5% is the industry standard for an "off net" NRR deal, with the "typical rate" being 2.5%. Gutshall Decl. (Def. Exh. 183) at ¶ 17. Guttshall does not opine on the industry standard for NRR on an

---

[7]   This figure is based on a 10% commission rate on the gross MRR received on these two projects, which was $195,197,933. *See* Def. Exhs. 187 and 188.

[8]   This discount rate was established by FiberLight's unopposed expert on this issue, Robert J. Taylor IV, who determined FiberLight's expected weighted average cost of capital ("WACC") based on the contractual or expected returns required by debt and equity investors in the business. *See* Bennett Thrasher Report (Def. Exh. 185) at 9-12. TAM did not object to the introduction of Mr. Taylor's report, nor did TAM advance a rebuttal expert on this issue.

"on net" deal, but believes that 0-2% is the industry standard where the agent's role is limited to introduction and facilitation, basing this percentage on the net (as opposed to gross) collected revenue for either MRR or NRR, but not both.  Gutshall Decl. (Def. Exh. 183) at ¶ 20; *see also* Dkt. No. 131 (Def. Proposed Findings) ¶ 103.  Again, the Court does not find the "on net" versus "off net" distinction meaningful or helpful in this case, nor does it find credible the contention that agents on an industry-wide basis are paid based on the carrier's net revenue.

The Court also does not find credible McGinness's opinion on NRR (*i.e.*, a flat 10-15% of gross revenue) for the reasons McGinness himself states in his report, namely, that "it is carrier, rather than the agent, that bears the risk of cost overruns or inaccurate forecasting." McGinness Rpt. (Plaintiff Exh. 1) at 11.  If the carrier bears the risk of inaccurate forecasting, the industry as a whole would not tolerate such a large percentage payment to the agent at the outset (unless this percentage were contractually agreed upon by the parties and submitted in the bid to the purchaser, neither of which occurred here).

Given these disparate competing opinions and the concerns they represent, the Court finds that equity favors an award of 2.5% for NRR.  The Court will accordingly award $2,569,252 to TAM in restitution for the market value of their agent services on the NRR component of the West and Central Texas projects.[9]

## IV.    California Independent Wholesale Sales Representatives Contractual Relations Act

Despite TAM's arguments to the contrary, the Court finds that its agent services securing the four lit service and dark fiber IRU deals solely within the State of Texas is not the type of wholesale transaction contemplated by the California legislature pursuant to the California Independent Wholesale Sales Representatives Contractual Relations Act ("the Act").  The intent of the Act is as follows:

> The Legislature finds and declares that independent wholesale sales representatives *are a key ingredient to the California economy*. The Legislature further finds and declares the wholesale sales

---

[9]  This figure is based on a 2.5% commission rate on the gross NRR received on these two projects, which was $102,770,076.

United States District Court
Northern District of California

representatives spend many hours *developing their territory* in order to properly market their products, and therefore should be provided unique protection from unjust termination of the *territorial market areas*. Therefore, it is the intent of the Legislature, in enacting this act to provide security and clarify the contractual relations between manufacturers and their nonemployee sales representatives.

Cal. Civ. Code § 1738.10 (emphasis added).

In spite of this clear California-specific geographic delineation, TAM's asserted at trial that the four deals at issue established a telecommunication network that *could* affect the California consumer given the interconnectivity of the nation's fiber optic networks. This claim is far too attenuated. Subject to the Act's personal jurisdiction requirement,[10] such an interpretation would allow any foreign corporation manufacturing a wholesale product with a connective cable component to be hauled into a California court and liable to their nonemployee sales representative pursuant to the Act. TAM has not cited, nor has the Court found, a California case that would permit the Court to interpret the Act in such an expansive manner. TAM has not cited, nor has the Court found in the evidence presented, evidence that the four deals at issue were within a California "territorial market area" subject to the Act's protections. Finally, TAM has presented no evidence that FiberLight — assuming without deciding that it qualifies as a "manufacturer" pursuant to the act[11] — intended that *these* four fiber optic networks would "eventually be resold or used by a California consumer." *See Reilly v. Inquest Tech., Inc.*, 218 Cal. App. 4th 536, 549 (Cal. Ct. App. 2013) (holding that the phrase "intended for resale to, or use by the consumers of this state" ([Cal. Civ. Code] § 1738.12, subd. (a)), must be interpreted to simply require an intention by the manufacturer that its product will eventually be resold or used by a California consumer.").

///

///

_____

[10] *See* Cal. Civ. Code § 1738.14.

[11] *See* Cal. Civ. Code § 1738.12(a) ("'Manufacturer' means any organization engaged in the business of producing, assembling, mining, weaving, importing or by any other method of fabrication, a product tangible or intangible, intended for resale to, or use by the consumers of this state.")

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

In light of the foregoing, FiberLight is found liable to TAM in the amount of $16,964,055, pursuant to the Court's equitable authority to imply a contract at law to avoid the unjust retention of the value of TAM's services, which benefited FiberLight.

**IT IS SO ORDERED.**

Dated: August 19, 2016

_____

SUSAN ILLSTON
United States District Judge